# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Marjorie Surface,                                    Civil No. 04-3896 (MJD/SRN)

      Plaintiff,

      v.                                    **REPORT AND RECOMMENDATION**

Jo Anne B. Barnhart,
Commissioner of Social Security,

      Defendant.

_____

Lionel H. Peabody, Esq., on behalf of Plaintiff

Lonnie F. Bryan, Assistant United States Attorney, on behalf of Defendant

_____

SUSAN RICHARD NELSON, United States Magistrate Judge

      Plaintiff Marjorie Surface seeks judicial review of the final decision of the Commissioner of Social

Security ("Commissioner"), denying her application for supplemental security income ("SSI"). See 42

U.S.C. §§ 405(g) and 1383(c)(3). The matter has been referred to the undersigned United States

Magistrate Judge pursuant to 28 U.S.C. § 636 and Local Rule 72.1(c). This Court has jurisdiction over

the claim pursuant to 42 U.S.C. §§ 405(g), 1383(c) and Title 5 U.S.C. § 706. The parties have submitted

cross-motions for summary judgment [Doc. Nos. 19 and 24]. Plaintiff has also brought a Motion for

Remand for Consideration of New and Material Evidence. [Doc. No. 28]. For the reasons set forth

below, it is this Court's recommendation that the Commissioner's decision be reversed and the case

remanded for further administrative proceedings consistent with this Report and Recommendation.

Plaintiff's Motion is granted to the extent it seeks that the Commissioner's decision be reversed and

remanded.

## I.   INTRODUCTION

Plaintiff Marjorie Surface ("Plaintiff") applied for SSI on May 31, 2002, claiming she has been disabled since May 1, 2002.  (Tr. 79, 80-83).  Plaintiff's alleged impairments include low back pain, fibromyalgia, right knee problems, and depression.  (Tr. 53, 56, 92, 130-135).  The Social Security Administration denied her application for SSI initially and on review.  (Tr. 53-62, 64-66).  Plaintiff timely filed a request for a hearing, which was held on November 6, 2003 before Administrative Law Judge ("ALJ") Michael D. Quayle.  (Tr. 28-53).  At the hearing, Ms. Surface was represented by Mr. Tom Ehrbright, who is not an attorney, and testified on her own behalf.  (Tr. 30-44; 45-48).  A vocational expert ("VE") also appeared and testified. (Tr. 44-49).  On February 27, 2004, ALJ Quayle rendered an unfavorable decision finding Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 15-25).  Ms. Surface filed an appeal with the Appeals Council on March 15, 2004, requesting that the decision of the ALJ be reviewed and reversed.  (Tr. 14).  The Appeals Council denied Plaintiff's request for review on June 24, 2004, making the ALJ's decision final. (Tr. 10-12).

On August 26, 2004, Ms. Surface commenced this civil action in federal court seeking review of the Commissioner's decision.  [Doc. No. 1].  The Commissioner answered on November 19, 2004, and now both parties have submitted cross-motions for summary judgment.  [Doc. Nos. 10, 19, 24].

## II.  STATEMENT OF FACTS

### A.      Background

Plaintiff Marjorie Surface was born in 1972 and was 31 years old at the time of the ALJ's decision. (Tr. 31, 80).  Plaintiff attended school through the 10th or 11th grade, and was in special education classes

2

for English and Math. (Tr. 98). Plaintiff later received her GED. (Tr. 31). She has worked in a few short term jobs including at a flower shop and fast food restaurant. (Tr. 106). Plaintiff is divorced and has four children under the age of 18, two of which are in her custody. (Tr. 32, 33).

### B.    Medical Evidence

Plaintiff has had a history of low back pain, knee problems, fibromyalgia, and depression. (Tr. 319, 356, 369, 379, 386). She saw Dr. Kassamali Jamal from 2001 through 2003 for these and other medical problems. (Tr. 255-320).

In May 2001, Plaintiff was seen at the Emergency Room of Virginia Regional Medical Center, Minnesota, for low back pain that radiated down her legs to her knees which was related to a prior injury. (Tr. 142). Plaintiff was pregnant and was advised to rest and take Tylenol. (Id.).

She saw Dr. Jamal in July 2001 and was diagnosed with asthma, bursitis of the hips, migraines, depression, and fibromyalgia. (Tr. 319-20). In September 2001, Plaintiff again saw Dr. Jamal for tendinitis in her right knee and received a steroid injection. (Tr. 317-18). In October 2001, Plaintiff was seen for pain in her left knee. (Tr. 387). An x-ray showed minimal narrowing of the joint. (Id.). Plaintiff was seen soon after on October 24, 2001, complaining of pain in her knees. (Tr. 385). Plaintiff stated that the pain began in March 2001 and had gotten worse. (Id.). It was aggravated by squatting, picking things up, stairs, and kneeling. (Id.). She was diagnosed with Patellofemoral pain syndrome. (Tr. 386).

On November 5, 2001, Dr. Jamal completed a medical opinion form diagnosing Plaintiff with fibromyalgia and a knee injury which made it difficult to climb stairs. (Tr. 163). He stated that, as a result, Plaintiff would not be able to perform any employment in the foreseeable future. (Id.). He recommended that living on a ground floor apartment would help Plaintiff avoid pain and discomfort. (Id.). Dr. Jamal

opined that Plaintiff did not have any developmental disability, mental illness, learning disability, or chemical disability.  (Id.).  Also in November 2001, Plaintiff self-listed herself at a level of 4 or 5 on an arbitrary 1-10 depression scale.  (Tr. 384).

On December 11, 2001, Plaintiff was seen for acute exacerbation of her back pain which radiated down both legs bilaterally.  (Tr. 379).  Plaintiff reported a ten or higher level of pain and  tenderness in the sciatic notch bilaterally.  (Id.).  She was diagnosed with lower back pain with spasm/sciatica and given Vicodin, Valium, and Naprosyn.  (Id.).  The next day Plaintiff complained that the back medication was not working and the nurse advised her to get another evaluation.  (Tr. 381).  Dr. Jamal made note of Plaintiff's reported severe pain in her back and down her legs and gave her Demerol, Vistaril, and Flexeril.  (Tr. 314).  By December 14, 2001, Plaintiff reported that the pain had improved and it was not radiating as much.  (Tr. 313).

On February 6, 2002, Plaintiff was seen at the Duluth Clinic in Virginia, Minnesota for anxiety, sweating, fatigue, and easy crying.  (Tr. 377).  She reported she had not been out of her house in three weeks.  (Id.).  Her Effexor-XR made her nervous and "tingling," and the Imitrex was not helping her headaches which she stated were behind both eyes and radiated into the occipital area.  (Id.).  She assessed her depression level to be at a 3-4 on the 1-10 depression scale.  (Id).  The doctor discussed panic disorder with her and she received a prescription for Zoloft and Zomig.  (Id.).

In March 2002, Plaintiff saw Dr. Jamal for non-specific diffuse pain and was again diagnosed with fibromyalgia.  (Tr. 306).

In May 2002, Plaintiff was hospitalized for low back pain.  (Tr. 143-147; 207-213).  Her MRI showed some annular bulging and a small, central annular tear consistent with lumbar discopathy.  (Tr.

4

143).  Plaintiff was diagnosed with back pain and lumbosacral discopathy and given Ibuprofen, Flexeril, and Tylenol #3.  (Id.).  Plaintiff returned to Dr. Jamal on May 20, 2002 for continued back pain that radiated to the right knee.  (Tr. 299).  She had probable sacroiliitis in her knees.  (Id.).  Plaintiff received an injection in her right upper sacroiliac with a good result as well as a referral for physical therapy.  (Id.).  On May 23, 2002 she again complained of ongoing back pain as well as limited range of motion and was told to continue with physical therapy.  (Tr. 298).  By June 4, 2002, Plaintiff reported that her back pain was better but she still felt pain with extreme movements.  (Tr. 296).  She also complained of severe headaches and insomnia.  (Id.).

On June 10, 2002, Plaintiff continued to report back pain that radiated into her right leg and limited range of motion.  (Tr. 295).  On that day, Dr. Jamal completed a second medical opinion form repeating that Plaintiff would not be able to perform any employment in the foreseeable future due to her L/S discopathy, fibromyalgia, and knee injury.  (Tr. 214).

Plaintiff was referred to Psychologist Susan Gillespie, MS, LP, at the Range Mental Health Center on June 11, 2002 to address some depression Plaintiff reported.  (Tr. 216-218; Tr. 216A, 217A, Transcript of Supplemental Record (Doc. No. 23) ).[1]  Dr. Gillespie opined that Plaintiff was oriented as to person, place, and time and showed no signs of hallucinations or delusions.  (Tr. 217A).  She seemed in pain after sitting during the session and was limping while leaving the office. (Id.).  She had normal speech, alertness and cognitive functioning.  (Id.).  Plaintiff's mood was depressed and she was tearful

---

[1]  At some point, part of Susan Gillespie's review was left out of the record.  However, her analysis was referenced by Dr. Huber in his background information, which indicates that it was present at some point to allow for such review.  (Tr. 228).  The record has since been supplemented.  See Transcript of Supplemental Record (Doc. No. 23).

when she discussed the death of her father.  (Id.).  Plaintiff also reported some anxiety and panic symptoms.

(Id.).  Dr. Gillespie diagnosed her with recurrent major depression with possible generalized anxiety

disorder and panic disorder, possible co-dependency personality traits, spinal problems, and fibromyalgia.

(Tr. 217A, 228).  She gave Plaintiff a Global Assessment of Functioning ("GAF") rating of 50.  (Tr. 217A,

228).

Also in June 2002, Plaintiff completed a Disability Report.  (Tr. 91-100).  She described her

problems as fibromyalgia, low back pain with symptoms into her legs, right knee problems and depression.

(Tr. 92).  She stated she could not be on her feet, walk, stand, or sit for long periods of time.  (Id.).  She

reported she could not sleep, had no concentration, and crying spells.  (Id.).  She said she needed a

wheelchair to move more than 200 yards.  (Id.).  Soon after, a Disability Report was filed by Jean Elmquist

of the Field Office.  (Tr. 101).  Ms. Elmquist noted that she did not observe or perceive Plaintiff having any

difficulty with the following areas: reading, breathing, understanding, coherency, concentration, talking, or

answering.  (Tr. 103).

On July 23, 2002, Plaintiff completed an Activities of Daily Living Questionnaire.  (Tr. 118-223).

Plaintiff reported that her back and legs hurt and she was depressed.  (Tr. 118).  She described that her

activities had changed since her impairment started.  (Id.).  She used to swim, hike and camp.  (Id.).  She

could not get out of the tub and had to take showers.  (Id.).  On a typical day her activities included talking

care of her two children who live with her.  (Tr. 119).  Plaintiff cooked simple meals and found mopping

and vacuuming difficult.  (Id.).  Her neighbor helped her with shopping but she did not do any yard work,

household repairs, or snow removal.  (Id.).  She had a car but stated that it was difficult to get in and out

of.  (Id.).  She stated she does not like being in public but had two good friends that help her.  (Tr. 120).

She explained that she moved to the first floor apartment because she could not climb stairs. (Tr. 122). In addition, she listed she had problems with concentration and memory which the pain made worse. (Id.). She was irritable and cried a lot under pressure. (Id.).

On July 27, 2002, Plaintiff's friend Mary Ann Lindgren, also completed an activities questionnaire. (Tr. 114-117). She stated that, on a typical day, Plaintiff got up, gave her children breakfast, then rested on the couch and watched television. (Tr. 114). If she was not feeling well, she would lay on the couch all day and her friends would help with the children. (Id.). Plaintiff would cook lunch and dinner for the family but had trouble sleeping. (Id.). She explained that Plaintiff had good days and bad days, and when she was feeling bad, she got moody. (Id.). Plaintiff could do housework for about 15 minutes and then needed to rest. (Tr. 116). She said that Plaintiff could not carry groceries and had to use a wheelchair when her back was out. (Id.). She also stated that Plaintiff was accident prone, forgetful, restless, had insomnia, and depression. (Tr. 117).

From July until September 2002, Plaintiff saw Dr. Jamal for increased and continued back pain, depression, and anxiety. (Tr. 275-276, 279, 283-287). In August 2002, Dr. Jamal noted that Plaintiff demonstrated a depressed mood, and diminished interest in pleasure, as well as a change in appetite and sleep pattern. (Tr. 282).

State agency physician Dr. Dayna L. Wolfe completed a physical Residual Functional Capacity ("RFC") assessment in September 2002. (Tr. 321-329). Dr. Wolfe opined that Plaintiff could occasionally lift or carry 20 pounds, frequently lift 10 pounds, sit, stand or walk about 6 hours in an 8-hour workday, and push or pull an unlimited amount. (Tr. 322). Plaintiff could occasionally climb a ramp or stairs, but was never to climb a ladder, rope, or scaffolding. (Tr. 323). Plaintiff's manipulative limitations

affected handling, fingering, and feeling, but not reaching.  (Tr. 324).  Dr. Wolfe stated that as a result of

these limitations, Plaintiff was to avoid  repetitive motions.  (Tr. 324).  Plaintiff showed no visual or

communicative limitations.  (Tr. 324-325).  Plaintiff's environmental limitations only included avoiding

concentrated exposure to vibration, fumes or poor ventilation.  (Tr. 325).  Light machinery was fine if

Plaintiff was stabilized with both hands.  (Id.).  Dr. Wolfe found Plaintiff's pain complaints partially credible

and opined that Plaintiff's symptoms were attributable to a medically determinable impairment and their

severity and alleged effect on function was consistent with the medical and non-medical evidence.  (Tr.

326).  Dr. Wolfe determined that Plaintiff had a light RFC.  (Tr. 328).  On February 26, 2003, Dr. Dan

Larson, reviewed all the evidence in the file, and affirmed the findings as written. (Id.).

On October 1, 2002, Dr. Jamal completed a medical opinion form regarding Plaintiff's physical

ability to do work-related activities.  (Tr. 224-227).  Based on Plaintiff's back pain and discopathy, Dr.

Jamal opined that Plaintiff could occasionally and frequently lift and carry up to 10 pounds, stand and walk

for about 4 hours, and sit for about 3 hours in an 8 hour day.  (Tr. 224).  Plaintiff required the ability to shift

positions at will.  (Tr. 225).  Plaintiff could sit or stand for 60 minutes before needing to change positions.

(Tr. 224-225).  Plaintiff had to walk around for 10 minutes every 60 minutes.  (Tr. 225).  Plaintiff could

rotate or flex her neck frequently, but could twist, stoop, crouch, climb stairs or ladders, or do repetitive

foot controls only occasionally.  (Tr. 225).  Dr. Jamal stated that Plaintiff's impairment affected her

reaching, handling, and pushing or pulling, but not her fingering or feeling.  (Tr. 226).  Plaintiff's only

environmental restriction included hazards such as machinery and heights.  (Id.).  Dr. Jamal opined that

Plaintiff's impairments would cause her to be absent from work more than three times a month.  (Tr. 227).

Dr. Jamal found that his findings were supported by Plaintiff's medical history, including her MRI, which

showed annular bulging and a central tear in her disc.  (Id.).

Plaintiff was seen at the Duluth Clinic for low back pain on October 24, 2002.  (Tr. 369).  Dr. Schandorf reviewed Dr. Jamal's opinions and found that Dr. Jamal's impression that Plaintiff would never get better and to pursue disability to be a bit pessimistic.  (Id.).

Also in October 2002, Dr. Jamal wrote a letter noting that Plaintiff had chronic problems with back pain due to her lumbar disc problems.  (Tr. 273).  As a result of her back pain as well as her limited schooling and learning disability, Dr. Jamal opined that, Plaintiff was not physically or mentally capable of sustaining gainful employment.  (Id.).

On October 30, 2002, psychologist Dr. Huber examined Plaintiff and completed a report.  (Tr. 228 - 232).  Dr. Huber included as background information, the findings of Psychologist Susan Gillespie, MS, LP, at the Range Mental Health Center from her June 11, 2002 examination of Plaintiff, some of which were left out of the original record but later supplemented.  (Tr. 228; 216-218; Tr. 216A-217A).  Dr. Huber found that Plaintiff was able to understand, remember, and follow at least simple instructions.  (Tr. 232).  She could sustain adequate attention and concentration, but her ability to complete work-like tasks with reasonable persistence and pace was poor.  (Id.).  Plaintiff was able to respond appropriately to at least brief and superficial contacts with co-workers and supervisors. (Id.).  However, her ability to tolerate stress and pressure in the workplace would be compromised by her chronic pain and insomnia. (Id.).  Dr. Huber's diagnostic impressions of Plaintiff included Recurrent Major Depressive Disorder with symptoms of Generalized Anxiety Disorder, Post Traumatic Stress Disorder, and Panic Disorder.  (Id.).  He found Plaintiff to have R/O Borderline Intellectual Functioning, fibromyalgia, debilitating headaches, episodes of syncope, and back problems that lead to chronic pain.  (Id.).  He gave Plaintiff a GAF score of 48.  (Id.).

Between October 2002 and February 2003, Plaintiff saw Dr. Jamal numerous times for several complaints including low back pain, leg pain, headaches, and depression.  (Tr. 256-269).

On January 20, 2003, state agency mental health professional Dr. James M. Alsdurf completed a mental RFC assessment as well as a Psychiatric Review Technique Form.  (Tr. 330-336; 337 - 350).  Dr. Alsdurf concluded that Plaintiff was not significantly limited in the areas of understanding  and memory as well as adaptation.  (Tr. 330-331).  Within the area of sustained concentration and persistence, Plaintiff was only found to be moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 331).  Plaintiff's ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes was moderately limited.  (Id.).  Dr. Alsdurf noted Dr. Huber's assessment and concluded that Plaintiff retained the capacity to concentrate on, understand, and remember routine, repetitive instructions, but would have marked problems with detailed or complex instructions.  (Tr. 332).  Plaintiff would be able to interact with co-workers or the public for brief, infrequent, and superficial contact.  (Id.).  Plaintiff's ability to follow an ordinary routine would be moderately impaired, but adequate to function with the ordinary level of supervision found in most customary work settings.  (Tr. 333).  Plaintiff's ability to handle stress would be moderately impaired, but adequate to tolerate the routine stressors of a routine, repetitive work setting.  (Tr. 333).  Dr. Alsdurf's assessment was affirmed by state agency mental health professional Dr. R. Owen Nelsen on February 26, 2003.  (Tr. 334, 337).

From March 2003 through September 2003, Plaintiff was seen for various issues including  back and leg pain, headaches, limited range of motion, insomnia, anxiety and depression.  (Tr. 356, 359, 415,

420-421, 432, 442, 445, 452, 460-468).  A lumbar discography performed on August 5, 2003, revealed marked degenerative findings at L5-S1 with concordant pain.  Dr. Dulebohn recommended back surgery for the marked annular disruption and disc space collapse.  (Tr. 415).

### C.    Plaintiff's Testimony

At the November 6, 2003, administrative hearing, Ms. Surface testified as to her impairments, conditions, and daily activities.  (Tr. 28-53).  She was represented by Mr. Ehrbright, who is not an attorney.  Plaintiff testified that she was born on October 3, 1972, and received her GED.  (Tr. 31).  She stated she was divorced with four children, but only had custody of two.  (Tr. 32).  She claimed her past work included working at a flower shop, a fast food restaurant, and a swimming pool, but she had not worked since May 2002.  (Tr. 33, 35).  Plaintiff explained that she never had a full-time job that lasted for more than six months because she would always be corrected and have to redo things as a result of being in special education in school and dyslexic.  (Tr. 36-37).  She stated that her physical problems included fibromyalgia, arthritis in her knees, asthma, nose surgeries.  (Tr. 34-35).  Mr. Ehrbright explained that she also has headaches and back problems which result in her not being able to walk at times, falling, and being in constant pain.  (Tr. 37).  He stated that as a result of her back pain, she suffered from depression and had a GAF score of 50 from a June 11, 2002 examination and a GAF score of 48 from an October 30, 2002 Social Security examination.  (Id.).  Plaintiff needed to quit smoking to have back surgery and had not yet done so.  (Tr. 38).  He explained that if she has surgery and it is successful, she would be able to "go on with her life."  (Id.).

Plaintiff testified that she had dealt with back problems since 1991 and had tried injections and physical therapy to relieve the pain.  (Tr. 380-39).  She stated she has had numerous visits to the

11

emergency room because she cannot handle her back pain which often radiates through her hips and down her leg. (Tr. 40). She testified that she falls because of the pain and has hurt herself doing so. (Id.). She affirmed that she was terrified about back surgery. (Id.).

Plaintiff stated that her roommate helps her do things that she cannot do herself such as helping her dress and with personal care on bad days. (Tr. 41). She has regular bad days of pain and is only pain free when she is on a medication. (Id.). If she is active one day she often has problems being active the next day and will have to take breaks throughout the day. (Tr. 42). She testified that she uses sleeping pills to sleep and feels guilty that she cannot live a normal life and take care of her kids. (Tr. 42-43). She had headaches that increased with stress. (Tr. 43). Plaintiff stated that even without her back problems she probably would not be able to work. (Tr. 43).

### D.    Vocational Expert's Testimony

Also at the November 6, 2003, hearing, Juletta Harren testified as a vocational expert hired by the Social Security Administration. (Tr. 44-50). After some clarification regarding Plaintiff's work history, the vocational expert testified that there was no relevant past work history. (Tr. 48). The ALJ posed a hypothetical question, asking Ms. Harren to consider an individual of Plaintiff's age, educational background, work history experience, who has the psychological ability to remember, understand, concentrate and carry out routine, repetitive instructions. (Id.). Her persistence and pace would be good enough for routine and repetitive tasks but not for detailed or complex tasks. (Id.). She has the ability to briefly interact with coworkers and the public at superficial levels, as well as the ability to handle an ordinary routine, repetitive, customary work setting. (Id.). The hypothetical individual could lift 20 pounds occasionally, 10 pounds frequently, and stand or sit for six hours. (Tr. 49). She could never use ladders,

ropes, or scaffolding, but occasionally use ramps and stairs. (Id.). She has limitations in gross manipulation, fingering, fine manipulation, and feeling and may need to avoid repetitive motion of work. (Id.).

At this point in the hearing, the tape which was recording the hearing appears to have ended and a second tape begun. (Tr. 49). A large portion of the hearing seems to not have been recorded during this change. It is unclear whether the first hypothetical was completed and it also appears that the ALJ went on to pose a second hypothetical that was also not captured on the record. Furthermore, the vocational expert's response to the hypotheticals or any further questioning was also not captured on record. The ALJ attempted to summarize the first and second hypotheticals as well as Ms. Harren's responses to both. (Id.). The ALJ states that the first hypothetical was basically the disability determinations found in the mental and physical RFC assessments from September 14, 2002, and January 20, 2003. (Tr. 49, 321-329, 330-336). He summarizes the VE's testimony as having cited cashiering jobs, unskilled stock attendant jobs, light janitor jobs, as well as assembly inspection packaging and assembly jobs. (Tr. 49). In addition, the ALJ stated that the VE included reduced numbers of inspecting and packaging jobs, stating she "downed 50 percent reduction." (Id.). The ALJ summarized his second hypothetical as including Dr. Huber's psychological restrictions and Dr. Jamal's physical restrictions. (Id.). The wording is unclear, but the ALJ paraphrased Ms. Harren's response to that hypothetical as stating that there was no work that Plaintiff could do given those limitations. (Id.). There appears to have been a discussion on cross examination regarding Plaintiff's limitations as to handling and fingering but the resolution of such discussion is not included in the ALJ's summary. (Tr. 49-50). The ALJ then summarized a comment by Plaintiff's representative, Mr. Ehrbright, about Dr. Jamal's and Dr. Huber's assessment of Plaintiff's unemployability.

(Tr. 50).  The ALJ asked Mr. Ehrbright if he had correctly recapped the testimony and whether he wanted to add anything or put anything else in the record.  (Id.).  Mr. Ehrbright's response was inaudible and incomplete in the transcript.  (Id.).  No further questioning was directed toward the vocational expert.

###    E.    The ALJ's Decision

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The Act further states that for an individual to be determined disabled, her physical or mental impairment(s) must be of such severity that she is not only unable to do his previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which she lives, or whether a specific vacancy exists for her, or whether she would be hired if she applied for work.  Id. at § 423(d)(2)(A).  On February 27, 2004, ALJ Quayle concluded that Ms. Surface was not disabled within the meaning of the Social Security Act.  (Tr. 15-25).

In determining whether or not Ms. Surface was disabled, the ALJ followed the five-step sequential process outlined at 20 C.F.R. § 404.1520.  At the first step in the analysis, the ALJ determined that Ms. Surface had not engaged in substantial gainful activity since the onset date of his disability.  (Tr. 19).  The second step in the sequential evaluation is to determine whether or not Ms. Surface had a severe impairment, defined as a medically determinable impairment or combination of impairments that significantly limits the individual's physical or mental ability to do basic work activities.  Id. at § 404.1521.  The ALJ determined that Plaintiff's physical impairments of disc bulging with related back pain, ulnar nerve palsy,

14

fibromyalgia, a patellofemoral syndrome, and a ganglion cyst were severe impairments under the Social Security Act.

The third step requires a comparison of the claimant's severe impairments with the impairments listed in Appendix 1, Subpart P, Regulations No. 4, Listing of Impairments to determine if any of the claimant's severe impairments meets or equals a listed impairment. Appendix 1 contains a Listing of Impairments which identifies a number of different medical conditions and describes the required level of severity for each condition. Equivalence is to be determined "on medical evidence only," not an assessment of overall functional impairment, unless the specific finding or criterion of the particular listing requires a measurement in terms of functional limitation. 20 C.F.R. § 1520(c)(3) and 1526. The ALJ concluded that while Ms. Surface had severe physical impairments, they did not individually or in combination meet or equal the requirements of any section of the Listing of Impairments. (Tr. 19).

The ALJ followed the special procedure required by the regulations at 20 C.F.R. 416.920(a) to evaluate the severity of Plaintiff's mental impairments. (Tr. 20-21). This procedure requires first, determinations of the existence of a medically determinable impairment, and second, the limitations resulting from any mental impairment as described in the Listing of Impairments in Appendix 1, Subpart P, Regulations No. 4. The medically determinable existence of the mental impairment is assessed by evaluation of specific paragraph A criteria found at 20 C.F.R., Part 404, Subpart P, Appendix 1, § 12.00. If the A criteria are met, the limitations are determined via paragraph B by examining four areas of function which have been found to be relevant to the ability to work and correspond to the criteria of most of the mental disorders listed in Appendix 1: activities of daily living; social functioning; concentration, persistence and pace; and episodes of decompensation. The rating of each of these four areas is compared with the

15

criteria set forth in the regulations for determining the severity of a mental impairment. The ALJ noted Plaintiff's indicated impairments to be depression and anxiety disorder and evaluated them under Section 12.04-Affective Disorders, and 12.06-Anxiety Related Disorders. (Tr. 20). The ALJ found that Plaintiff had mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (Id.). The ALJ found that based on these determinations, Plaintiff's affective disorder and anxiety related disorder were severe, but were not present to the degree that meets or equals the criteria of the Listing of Impairments.

The last two steps in the evaluation require the ALJ to determine whether the Plaintiff has the residual functional capacity (RFC), despite her impairments, to perform her past relevant work, or lastly, any other work existing in significant numbers in the national economy. In determining Plaintiff's RFC, the ALJ evaluated the medical records, testimony, and assessments of Plaintiff's subjective complaints under Social Security Ruling 9607p, 20 C.F.R. §§ 416.929(c), and Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).

The ALJ concluded that Ms. Surface had a RFC to lift and carry a maximum of twenty pounds occasionally and ten pounds frequently. (Tr. 21). Plaintiff could stand, walk, or sit for a maximum of six hours in an eight hour day. (Id.). Plaintiff could not work on ladders, ropes, or scaffolds, and could only occasionally climb ramps or stairs. (Id.). Plaintiff required routine and repetitive instructions and had the pace and persistence for routine, repetitive work. (Id.). The ALJ determined that Plaintiff could tolerate only brief and superficial contact with others. (Id.).

In making his determination, the ALJ considered Plaintiff's subjective allegations of pain and other

16

symptoms and acknowledged that she was suffering pain.  (Tr. 22).  The ALJ determined, however, that

Plaintiff's allegations of an inability to perform any work-related activities, were not wholly credible because

he found significant inconsistencies throughout the record.  (Tr. 23).  The ALJ concluded that the Plaintiff's

activities of daily living, course of medical treatment and use of prescription medication, her work history,

and inconsistent statements all suggest that her testimony was not entirely credible.  (Tr. 23).  Furthermore,

the ALJ noted that Plaintiff's homemaker status and responsibility of caring for two of her children

suggested to him that the Plaintiff had incentive to stay out of the work force.  (Id.).

The ALJ also considered the medical opinions in the record including those of the State Agency

physicians and psychologists, Dr. Wolfe and Dr. Alsdurf, to which he stated he gave some weight.  (Id.).

The ALJ stated that he placed great weight on Dr. Huber's opinion because he was an examining source,

and included RFC restrictions consistent with those of Dr. Huber.  (Tr. 22).  The ALJ concluded however,

that the medical evidence did not contain objective findings to support the extreme degree of limitation

identified by Dr. Jamal.  (Id.).  The ALJ stated that, as a result, he did not place great weight on Dr. Jamal's

opinion because it appeared to be based on incorrect information and the record did not establish that his

criteria for a disabled person is consistent with that used by the Social Security Administration.  (Id.).

Finally, the ALJ noted the vocational expert's testimony that the hypothetical individual presented

would be capable of making a vocational adjustment to other work including work as a cashier, stock

attendant, light janitor, assembly, inspecting, and packaging.  (Tr. 24).  The ALJ determined that the

vocational expert's testimony was credible, persuasive and uncontradicted.  (Id.).  Based on this testimony,

the ALJ concluded that considering Plaintiff's age, education, work experience, and RFC, there were jobs

existing in significant numbers in the national economy that Plaintiff could perform.  (Id.).  As a result, the

ALJ found Ms. Surface not disabled, as defined in the Social Security Act, and she was not eligible for supplemental security income. (Id.).

### III.  STANDARD OF REVIEW

Judicial review of the final decision of the Commissioner is restricted to a determination of whether the decision is supported by substantial evidence on the record as a whole.  See 42 U.S.C. § 405(g); Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998); Gallus v. Callahan, 117 F.3d 1061, 1063 (8th Cir. 1997); Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989).  Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Jackson v. Apfel, 162 F.3d 533, 536 (8th Cir. 1998); Black v. Apfel, 143 F.3d 383, 385 (8th Cir. 1998).  In determining whether the Commissioner's decision is supported by substantial evidence in the record as a whole, the Court must evaluate all of the evidence in the record including evidence supporting the Commissioner's findings and evidence that detracts from the decision. Brand v. Sec. of Dept. of Health, Ed. and Welfare, 623 F.2d 523, 527 (8th Cir. 1980).  In determining whether evidence is substantial, a court must also consider whatever is in the record that fairly detracts from its weight. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999);  Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989) (citing Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951)).

A court, however, may not reverse merely because substantial evidence would have supported an opposite decision.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000) (internal citations omitted); see also Gaddis v. Chater, 76 F.3d 893, 895 (8th Cir. 1996).  The Court may reverse the Commissioner's decision if the evidence compels reversal, not merely because the evidence supports a contrary decision. Williams v. Sullivan, 960 F.2d 86, 89 (8th Cir. 1992).

In social security cases, the reviewing courts are generally guided by the following factors:

1)      Findings of credibility made by the ALJ;
2)      Education, work history and age of the claimant;
3)      Medical evidence given by the claimant's treating physicians;
4)      Subjective complaints of pain and description of claimant's physical activity and impairments;
5)      Corroboration by third parties of claimant's impairments;
6)      Vocational testimony based on proper hypothetical questions fairly setting forth the impairments; and
7)      Testimony of consulting physicians.

Brand, at 527.

## IV.  DISCUSSION

Plaintiff argues that the ALJ's decision is not supported by substantial evidence in the record as a whole.  Specifically, Plaintiff contends that the ALJ inappropriately rejected the opinions of Dr. Jamal, the treating physician, and failed to followed the restrictions given by Dr. Huber, an examining psychologist to whose opinion he claimed he gave great weight.  Plaintiff also argues that the ALJ's credibility assessment is not supported by the record as a whole and finally, that the record was not fully and fairly developed as the transcript of the hearing was incomplete.

Defendant responds that the ALJ appropriately addressed and incorporated the opinions of Dr. Jamal and Dr. Huber and adequately analyzed Plaintiff's credibility.  Defendant argues that the ALJ posed a proper hypothetical and that the VE's testimony constitutes substantial evidence supporting the ALJ's decision.  Defendant contends that the ALJ's summary of the lost parts of the hearings was adequate to complete the record.

Without deciding the other grounds raised by Plaintiff, this Court concludes that the deficiency in the record makes it impossible to determine if the ALJ's findings are supported by substantial evidence on

19

the whole.

This Court's role in reviewing the final decision of the Commissioner is restricted to a determination of whether the decision is supported by substantial evidence on the record as a whole.  See 42 U.S.C. § 405(g); Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998); Gallus v. Callahan, 117 F.3d 1061, 1063 (8th Cir. 1997); Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989).  Testimony from a vocational expert based on properly phrased hypotheticals constitutes substantial evidence sufficient to support an ALJ's decision to deny a plaintiff's claim for benefits.  See Cruze v. Chater, 85 F.3d 1320, 1326 (8th Cir. 1996). The Court may not reevaluate the evidence presented in the record, but rather may only determine whether or not a decision to deny benefits is supported by "substantial evidence."  Bailey v. Heckler, 576 F.Supp 621, 622 (D.D.C. 1984), citing, Richardson v. Perales, 402 U.S. 389 (1971).  A full transcript of the administrative hearing serves to aid the court in making its determination.  Bailey, 576 F.Supp at 622, citing, Smith v. Califano, 470 F.Supp. 898 (D.D.C. 1978).  An ALJ has a duty to fully develop the record, even when the claimant is represented by counsel.  Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983). That duty is heightened when the claimant is not represented by an attorney.  See Highfill v. Bowen, 832 F.2d 112, 115 (8th Cir. 1987).

If the record is incomplete, judicial review may be made impossible and remand is necessary. Bailey, 576 F.Supp at 622-24; see also Highfill, 832 F.2d at 115 ("Unfairness or prejudice resulting from an incomplete record – whether because of lack of counsel or lack of diligence on the ALJ's part – requires a remand.").  Gaps in a record that do not interfere with comprehension of testimony to the extent that they hinder review may not warrant remand.  Ward v. Heckler, 786 F.2d 844, 848 (8th Cir. 1986).  However, it is not part of the court's role in review of such circumstances, to determine whether the absent parts of

the record would change the reading of the total record, or whether the ALJ properly took into consideration absent testimony when reaching his decision. Bailey, 576 F.Supp. at 624.

> "Whatever the probabilities, the absence of a complete record frustrates judicial review. The role of a reviewing court is to ensure that appropriate tests and standards are applied and maintained. The court is not to speculate as to whether certain information was or was not considered by the ALJ or whether lost testimony does or does not support his findings. Stewart v. Harris, 509 F.Supp 31 (N.D.Cal. 1980). It does not matter if the record is merely incomplete, e.g., testimony lost because of a malfunctioning tape recorder, Stewart v. Harris, supra, or if the record of the hearing was lost altogether. Williams v. Secretary of HEW, 481 F.Supp.69 (S.D.N.Y. 1979) (tape recording of the hearing totally inaudible). When the record is incomplete on a dispositive factual issue, there is an inadequate basis on which the court can review the Secretary's determination. Therefore, the appropriate remedy is remand."

Id., at 624 (educational level left out of record made judicial review impossible and remand appropriate).

In this case, the ALJ made his determination based on the testimony of the vocational expert that there were jobs available in the economy that Plaintiff could perform. However, the actual record as to the hypotheticals, as well as the vocational expert's testimony is deficient. Part of the first hypothetical, the entire second hypothetical, and all of the vocational expert's testimony in response to the hypotheticals and any further questioning was not included in the transcript. The ALJ explained in the hearing that the tape recording of the hearing had malfunctioned and attempted to summarize the hypotheticals and the VE's testimony. While the ALJ's summary may or may not have been an adequate rendition of the record, it is not up to this Court to try to guess at what is actually missing from the record and whether the ALJ adequately addressed those parts in his analysis.

Due to this deficiency, this Court lacks the hypotheticals as well as most of the vocational expert's testimony upon which the ALJ relies in making his determination. This is not a case where a few words on a page were missing, but rather, the gaps in the hearing record are significant enough to interfere with

21

the comprehension of key testimony which forms the basis of the ALJ's decision.  The ALJ stated, and the Defendant concurred, that the ALJ reached his determination based on the vocational expert's testimony. However, because the hypotheticals are missing from the record, this Court is unable to determine whether the hypotheticals posed to the vocational expert were adequate.  As a result, this Court cannot determine whether the vocational expert's testimony constitutes substantial evidence to support the ALJ's decision. Due to the deficiencies in the record, this Court is unable determine whether the ALJ's decision was supported by substantial evidence on the record as a whole.  We are compelled to reverse the Commissioner's decision and recommend that the case be remanded for further administrative proceedings consistent with this Report and Recommendation.  A new hearing should take place and measures should be taken to ensure a complete record is made, particularly of the hypotheticals posed to the vocational expert and the vocational expert's testimony.  While the Court is not remanding this case pursuant to Plaintiff's Motion for Remand for Consideration of New and Material Evidence [Doc. No. 28], any new evidence that Plaintiff has presented in support of that motion should be considered during this new hearing.

## V.  RECOMMENDATION

Based on the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.  Plaintiff's Motion for Summary Judgment [Doc. No. 19] be **GRANTED** to the extent it seeks that the Commissioner's decision be reversed and remanded for further administrative proceedings consistent with this Report and Recommendation;

2.  Defendant's Motion for Summary Judgment [Doc. No. 24] be **DENIED**;

3.  Plaintiff's Motion for Remand for Consideration of New and Material Evidence

[Doc. No. 28] be **DENIED**.

DATED: October 24, 2005                          s/Susan Richard Nelson
                                                 SUSAN RICHARD NELSON
                                                 United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **November 8, 2005**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof.  A party may respond to the objecting party's brief within ten days after service thereof.   All briefs filed under the rules shall be limited to ten pages. A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.